## CLEAR v. FOX.

*(Circuit Court, E. D. Virginia.   April, 1885.)*

NEW TRIAL—EXCESSIVE DAMAGES.
  A court will set aside a verdict as contrary to the law and evidence as often as considerations of justice may seem to demand.   Where one jury found a verdict for $15,000, which was set aside, and another jury found a subsequent verdict in the same case for $9,500, this latter verdict was set aside.

In *Assumpsit.*

Two verdicts in favor of the plaintiff were set aside in this case. The nature of the claim and the principal facts of the case are set out in the following opinion.

*Marge & Fitzhugh,* for plaintiff.

*S. Ferguson Beach,* for defendant.

HUGHES, J.   When the evidence was concluded at the original trial of this case, I thought it was one in which the jury, from sympathy for a worthy man, rather than on strict grounds of legal right, might allow the plaintiff two or three thousand dollars.   When they gave a verdict for $15,000, I had no doubt that it was my duty to set it aside.   On the second trial, the jury has given a verdict for $9,500; and I am now to pass upon the motion to set that verdict aside. These successive verdicts of exceptionally intelligent juries have given the case an importance which imposes upon me the duty of reducing to writing my views on the law questions involved.

In doing so it will be necessary for me to state in outline my own understanding of the leading facts of the case, which I shall do with no pretension to absolute accuracy of statement, and only to such extent as shall serve the purpose of developing the legal questions on which the case depends.

The defendant, Fox, was owner of a large and well-known gold property in Spottsylvania county, Virginia, which had, under previous owners, been profitably worked.   Clear, the plaintiff, who had mined in California, applied to him for a lease, giving a surface-mining privilege.   Obtaining this, Clear went upon the property and operated upon it for about seven years.   Out of their mutual correspondence and transactions during this period grew this suit, in which Clear claims upwards of $30,000 as a percentage due him on an alleged sale of the property, and claims also a *quantum meruit* for services rendered.

The plaintiff, Clear, went upon the Whitehall property of defendant upon a contract that he was to have half the gold he could obtain from surface mining, and was to have the use of the farm and the dwelling-house for a nominal rent.   The leases were from year to year.   He was, from the beginning, repeatedly informed by Fox, the defendant, that he was not to expect the latter to lay out any money on the place.   From the outset both Fox and Clear looked to a sale

of the property; and there grew out of this expectation a contract that Clear was to do what he could towards effecting a sale, and that he was to have 5 per cent. of the purchase price, if a sale should be made. Afterwards, in the course of correspondence, Fox voluntarily informed Clear, in several letters, that if the property should be sold for more than $100,000 by his procurement, he should have a bonus out of the excess in addition to the 5 per cent. These understandings as to what should be done in the event of a sale all went upon the express proviso that the sale contemplated was to be out and out, for money. It was upon such a sale for money, if made, that Clear was to receive 5 per cent. of the purchase price, and a bonus in addition on the excess, if the amount received should exceed $100,000. As a result of this projected sale, and of numerous negotiations that were from time to time on foot for that purpose, Clear began to do this and that thing on the land with a view of opening and displaying to purchasers its veins, resources, and merits. He dug ditches and trenches, and made drains here and there, from time to time, for this purpose, and money was furnished him by Fox to pay for such work, when requested to do so by Clear. Up to the termination of their mutual operations, in the winter of 1883, Clear had obtained from Fox three or four thousand dollars, and had made, besides, from the property by surface mining, some $5,000 in gold, by the spring of 1880 or 1881. How much gold Clear obtained between that time and the winter of 1883 does not appear. Probably Clear's receipts of cash from Fox and in gold from the mine aggregated as much as $10,-000 during the seven or eight years in which he had possession of the property. What Clear's expenditures were, during this period, in making openings and developments, and otherwise, does not definitely, or even approximately, appear.

There is no proof that Clear is an educated, scientific, mining engineer. From all that is shown by the evidence, I consider that he is rather an operative than a scientific miner,—a practical miner, whose knowledge of the business has been derived from personal experience and several years of manual labor in surface mining, and such reading, if any, as his occupation may have induced. But whether he was a scientific or a practical miner, a high-priced or a low-priced man, there was nothing in his express contracts, or his correspondence with Fox, to create a claim, or even an expectation, for compensation on general grounds of *quantum meruit.* The existence of express contracts of lease, and the industrious iteration by Fox, in his letters to Clear, that he would make no cash outlays on the property, nor authorize engagements that would entail them upon him, precluded Clear from bestowing services or making outlays that would entitle him to general *indebitatus assumpsit* claims. I do not consider that he had, in law, any right to a verdict for any amount on the general score of *quantum meruit.* But even if he had, they could not be very considerable. Most of his class of men would regard

three or four hundred dollars a year, with dwelling-house free, and unlimited privileges of garden and farm, as affording a fair living, especially when there was coupled with them the chance of making a handsome percentage on the sale of a property valued at a minimum of $100,000. On the score of general services rendered, I do not think Clear had, in law, any right to compensation for them; and, even if he had a right to some compensation, I do not think it should sound in very many thousands of dollars.

Passing to the claim for compensation for services in the sale of the property,—which is, technically speaking, the foundation of this suit,—it seems, that both parties worked faithfully to bring about a sale out and out, for money, for seven years or more; and that their efforts and hopes were all disappointed. At last the thought which had been always repelled before by Fox began to be entertained by him of incorporating the Whitehall property instead of selling it, and putting it in the form of shares in a joint-stock company. In the negotiations which terminated in an incorporation in lieu of a sale of the property Clear and Fox were both active and harmonious participants. They seem both, by force of necessity and under the influence of a common despair of effecting a sale for money, to have abandoned the effort to do so; and it seems to me perfectly clear that, with the failure and abandonment of that project, the contract and understandings which had been had between Clear and Fox, relating expressly and exclusively to a sale of that character, were, in fact as well as in law, abandoned by both of them. There arose such an understanding as to the compensation Clear should get from converting the property into a corporation as can be inferred from sundry expressions which were used by Fox in his later letters to Clear, declaring that he would see that he was provided for in the corporation that was formed as one of nine managing corporators. The very fact that these expressions were used by Fox, and that they were received without protest by Clear, shows that the old provision for Clear of a percentage in money on a sale for money was no longer contemplated, because Clear could hardly claim commissions from buyers and seller both.

The first scheme for a joint-stock company, in which Clear was in terms, and in a manner satisfactory to himself, provided for as a corporator, fell through, with the full consent, and in some degree by the active agency, of Clear. In the second scheme, the company received its deed from Fox and his signature to the contract of organization, on the express condition that Clear was to be one of the original nine corporators. To that scheme of organization Clear gave his full and unconditional consent. If the company which has been organized under that scheme has since excluded Clear from the privileges and rights stipulated in his behalf by Fox, no evidence being adduced to show that this was by the contrivance or even the consent of Fox, the wrong to Clear is that of the corporation and not of Fox;

and I cannot see that Clear has any right of action against Fox. Summing up what I have said, Clear had a valid claim to commissions on a sale for money, in the contingency of such a sale being made. His original contract related exclusively to such a sale, and his rights under it were wholly contingent upon a sale. When the project for such a sale was abandoned, his contract relating to it expired, and his rights under it became *nil.*

The scheme of incorporation was substituted for a sale out and out for money; and whatever rights Clear had under the new scheme could grow only out of such new contract as Fox may have made with him relating to the new scheme itself. The contract, which related exclusively and expressly to the lapsed and abandoned scheme, cannot be applied to the new scheme, of which neither party had any thought when they entered into the original contract. The error of the jury consisted in applying the contract about the abandoned scheme to the new and different scheme. This was neither legal nor just. It was both illegal and unjust.

Such are my views of this case. I have endeavored to avoid a strict detail of facts, and have confined myself to such an indication and outline of them as would illustrate the points of law on which I base my action. On the motion now before the court, I do not think that Clear has any legal claim against Fox for commissions on the sale of the Whitehall property. I do not think, in view of the terms of his lease of the farm and of surface mining privilege, that he has any general *indebitatus assumpsit* claim against Fox for services rendered on the property. Legally his claims are nothing; though equitably I would like to know that he could be accorded a few thousand dollars.

These views may be very mistaken, but they are fixed and I cannot get rid of them. How, then, can I allow a verdict for the large sum of $9,500 to stand? As a short and easy way of getting rid of personal trouble, and avoiding the discharge of an unpleasant duty, I might let it stand, throwing the responsibility on the jury. But I should always feel that I had allowed injustice to be done, and the legal rights of a stranger to be violated.

On the broad grounds that the verdict is contrary to the law of the case, and does not do justice between man and man, it must be set aside.